# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Marriage of:

CHARLES ARMAND BACHMANN,

               Appellant,

and

JENNIFER JO BACHMANN,

               Respondent.

DIVISION ONE

No. 83540-8-I

UNPUBLISHED OPINION

DWYER, J. — Charles Bachmann challenges the trial court's distribution of property in the dissolution of his marriage to Jennifer Bachmann. Charles[1] contends that the trial court erred by classifying certain assets and debts as community property, rather than his separate property. Finding no error, we affirm.

I

Charles and Jennifer Bachmann were married on May 4, 2004 in Phoenix, Arizona. Charles and Jennifer have one child, C.B. At the time the parties were married, Charles owned 15 percent of the shares of BBK Tobacco and Foods/HBI (HBI). Jennifer began working for HBI shortly after marrying Charles. Both parties left their employment with HBI after a falling out with the business's majority shareholder in March 2008.

---

[1] Because the parties share a last name, we refer to them by their first names. No disrespect is intended.

Shortly after leaving their employment at HBI, Charles and Jennifer signed a Bachmann Family Trust Agreement (the Trust), which specified that any property placed into the Trust would be community property, regardless of how it was initially characterized. Both Charles and Jennifer were named as trustees. Although the Trust was created in Arizona, all of the property belonging to the Trust at the time of separation was situated in Washington.

In 2007, the parties purchased a home located in Oak Harbor, Washington. The home was placed into the name of the Trust. In 2009, the parties relocated from Arizona and moved into the previously purchased Oak Harbor home.

The parties later moved into a house in Coupeville, Washington. The down payment for this home was paid using funds held by the Trust. The Oak Harbor property continued to be held by the Trust and was rented to tenants.

In 2010, the parties engaged in arbitration with HBI after HBI failed to pay Charles the value of his shares pursuant to a stock redemption agreement. Charles was awarded $820,000 in the arbitration. Upon payment by HBI, the funds from the award were placed into the Trust's bank account.

Shortly before leaving Arizona, the parties founded Starfish Holdings, LLC, a company that imported dog food from Canadian company NRG and resold the dog food to consumers and pet supply stores. Starfish was incorporated in Washington in 2010. Funds for the business originated from the Trust. Until the time of their separation, both parties were involved in Starfish's operation, though Charles did the majority of the work. Starfish was shuttered in 2020 when NRG

2

went out of business.

The parties separated on May 3, 2017, when Jennifer moved out of the Coupeville home and into the Oak Harbor home with C.B. On May 11, 2017, Charles petitioned for dissolution.

A bench trial was conducted from March 23 to April 1, 2021 in Island County Superior Court. Both parties testified at trial, as did guardian ad litem Donna Detamore, the parties' former neighbor John Fraught, Charles's sister Denise Bachmann, and James Jaworski, the former owner of NRG. The parties also submitted thousands of pages of exhibits both during the trial and after (at the court's request), which the court reviewed thoroughly before issuing its decision.

On May 24, 2021, the trial court sent a 26-page letter to both parties outlining its decision on all contested issues, including the division of property. The letter was explicitly incorporated by reference into the "Findings and Conclusions About a Marriage" entered on August 13, 2021.

The trial court found that the funds remaining from Charles's arbitration award, totaling $72,628.98, was community property by virtue of having been placed in the Trust. The court also found that both houses were community property, as they had been purchased during the marriage and paid for using funds from the Trust.

The trial court found that Starfish was a community asset, both by virtue of having been funded through the Trust and because both parties had contributed to the business's success. Because Starfish was no longer in existence at the

time of the court's decision, the trial court determined that it could not put a value on the business. However, the trial court found that Charles had dissipated Starfish's assets by issuing checks to himself that could not be explained as legitimate business expenses and by using the business's bank accounts to pay directly for his personal expenses. Charles argued at trial that the removal of assets from Starfish was for repayment of a loan that he had previously made to the company, but the trial court determined that Charles was not credible.

The court awarded the home in Coupeville to Jennifer, as this would allow C.B. to continue attending the school where he was currently enrolled. Jennifer would also be responsible for the remainder of the mortgage payments for the property. The trial court ordered that the Oak Harbor property be sold and the proceeds split evenly between the parties.[2]

Although the trial court recognized that its division of community property did not result in an equal split of the community assets, it determined that the division was nevertheless just and equitable, because "it is undeniable that the husband took money out of a community asset for his personal expenses." The trial court also deemed the award to be just and equitable because Charles had a far greater future earning potential than Jennifer.

The trial court awarded $65,000 in attorney fees to Jennifer in various pretrial orders, but declined to award her any additional fees in its final decision.

Charles appeals.

---

[2] There was no mortgage on the Oak Harbor home at the time the parties separated.

II

Charles contends that the trial court erred by characterizing certain assets and expenditures as community property. This is so, he asserts, because those assets and expenditures were traceable to transactions that occurred after the date of separation. We disagree.

The trial court's characterization of property as community or separate is a legal question subject to de novo review. In re Marriage of Mueller, 140 Wn. App. 498, 503-04, 167 P.3d 568 (2007). Although property is characterized as of the date of its acquisition, the date alone is not dispositive. In re Marriage of Sedlock, 69 Wn. App. 484, 506, 849 P.2d 1243 (1993) (citing Burch v. Rice, 37 Wn.2d 185, 190, 222 P.2d 847 (1950)). Rather, the test for determining a property's character is "'whether it was acquired by community funds and community credit, or separate funds and the issues and profits thereof.'" Sedlock, 69 Wn. App. at 506 (quoting Katterhagen v. Meister, 75 Wash. 112, 115, 134 P. 673 (1913)). Furthermore, property that would ordinarily be categorized as separate property may be converted to community property by virtue of an agreement between spouses. In re Marriage of Schweitzer, 132 Wn.2d 318, 324, 937 P.2d 1062 (1997).

Charles asserts that the following assets or expenditures were his separate property or debt, rather than community property or debt:

- $209,590.12 in checks written by Starfish to Charles;
- $12,597.61 in charges to Charles's American Express (AMEX) card;
- $5,939.23 in charges to Charles's Alaska Airlines card;
- A wire transfer from Toronto Dominion Bank to Starfish's bank

5

account in the amount of $23,504.94;
- $85,999.75 worth of cigarette papers, paid for from Starfish's bank account;
- $4,788.95 paid to "The Moorings LTD Booking" from Starfish's bank account;
- Two trademark processing fees for "Teas Plus TM";
- Two deposits of $4,080 each into Starfish's bank account from Canna Network Ente; and
- $36,445.22 from Charles's HBI retirement account.

We divide these items into three categories: deposits to and expenditures from Starfish's bank account, credit card charges, and Charles's retirement account.

A

The first category of items are the deposits to and expenditures from Starfish's bank account. This includes the following items: $209,590.12 in checks written to Charles, a wire transfer from Toronto Dominion Bank in the amount of $23,504.94, $85,999.75 worth of cigarette papers, the $4,788.95 paid to The Moorings, and two $4,080 deposits from Canna Network Ente.

In its letter to the parties, incorporated into its findings of fact, the trial court concluded that Starfish was a community asset, as it had been funded using community property from the Trust and both parties were integral to the business's success. Notably, Charles does not assign error to this conclusion or to any of the facts supporting it. "Unchallenged findings of fact are verities on appeal," and "[u]nchallenged conclusions of law become the law of the case." Rush v. Blackburn, 190 Wn. App. 945, 956, 361 P.3d 217 (2015).

Starfish did not cease to be a community asset upon the parties' separation. Property is presumed to maintain its original character unless there is direct evidence to the contrary. In re Madsen's Estate, 48 Wn.2d 675, 676-77,

296 P.2d 518 (1956). Furthermore, "where separate funds have been so commingled with community funds that it is no longer possible to distinguish or apportion them, all of the commingled fund, or the property acquired thereby, is community property." E. I. DuPont De Nemours & Co. v. Garrison, 13 Wn.2d 170, 176, 124 P.2d 939 (1942).

Because Starfish no longer existed by the time of trial, the trial court could not award the business to either party. The characterization of Starfish as a community asset was still relevant, however, as Charles used the business to dissipate community assets following the parties' separation. Dissipation of community assets is one of the factors that the trial court may consider in creating a just and equitable distribution of property. In re Marriage of Williams, 84 Wn. App. 263, 270, 927 P.2d 679 (1996). Here, the trial court found that between 2017 and 2020, Charles regularly paid for personal expenses using Starfish's funds. It also found that Charles's personal expenses were so thoroughly commingled with Starfish's business enterprises that it could not discern what rightfully belonged to the community and what did not.

By assigning the value of the dissipated assets to Charles, the trial court was determining how much community property Charles should have been in possession of at the time of trial had he not used Starfish for his personal gain. This was a proper determination for the trial court to make in deciding what to award to each of the parties. There was no error.

Charles additionally contends that there is no evidence to support the trial court's finding that he used Starfish assets for his own personal expenses.

7

Charles makes this argument for the first time in his reply brief. "An issue raised and argued for the first time in a reply brief is too late to warrant consideration." Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). We therefore decline to address this argument.

B

The second category of assets and expenditures that Charles contends were mischaracterized are the transactions made with Charles's credit cards. This includes the $12,597.61 in charges to the AMEX card, $5,939.23 in charges to the Alaska Airlines card, and the trademark processing fee.

In its findings of fact, the trial court found that the AMEX card in Charles's name, although used to charge expenses incurred after the parties' separation, was paid for using funds in Starfish's bank account.[3] Although Charles's brief is not a model of clarity, it appears that Charles does not challenge this finding. Together with the finding that Starfish was community property, the trial court's finding that the AMEX card was paid for using Starfish's money supports the trial court's conclusion that the purchases made with the AMEX card constituted a dissipation of community assets.

Similarly, the trial court's unchallenged findings of fact also support its conclusion that the Alaska Airlines credit card was also used to dissipate community property. The trial court found that the Alaska Airlines credit card was funded partially by the Starfish bank account and partially by a bank account at Alaska USA held by Charles. The trial court's review of the evidence led it to find

---

[3] The trademark processing fee was charged to the AMEX card.

that the Alaska USA bank account had "many unexplained deposits" of large sums of money. Given the trial court's findings that Charles was not an "accurate record keeper" and regularly commingled personal and business funds, the natural inference is that those deposits were funds that rightfully belonged to Starfish, i.e., that the deposits were community property. As Charles's brief on appeal makes no mention of the deposits, the trial court's finding that the deposits were community property is a verity. The trial court thus did not err in finding that Charles used the AMEX card and the Alaska Airlines credit card to dissipate community assets.

C

Charles finally assigns error to the trial court's finding that a portion of his retirement account from HBI, totaling $36,445, was community property.[4] Charles does not dispute that four years of his employment at HBI coincided with his marriage. Rather, Charles contends that the only evidence on record established that all contributions made to his retirement account were made before his marriage.

"A party seeking review has the burden of perfecting the record so that the reviewing court has before it all of the relevant evidence" necessary to address the issues raised on appeal. State v. Vazquez, 66 Wn. App. 573, 583, 832 P.2d 883 (1992). We cannot consider arguments unsupported by the record. Cowlitz Stud Co. v. Clevenger, 157 Wn.2d 569, 574, 141 P.3d 1 (2006). Because

---

[4] This amount was a mere fraction of the total value of the retirement account Charles established during his employment with HBI.

Charles did not designate any of the admitted exhibits as part of the record on appeal,[5] we cannot address his argument that the trial court's finding was not supported by the record.

III

Charles next asserts that the trial court's distribution of assets—both community and separate property—was neither just nor equitable and therefore constituted an abuse of discretion. This is so, he asserts, because the court's division of assets resulted in Jennifer receiving approximately three-quarters of the community property. We disagree.

A trial court has considerable discretion in making a property division, which will not be reversed on appeal absent a showing of manifest abuse of discretion. In re Marriage of Kraft, 119 Wn.2d 438, 450, 832 P.2d 871 (1992). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

The trial court's distribution of property in a dissolution action is guided by statute, which requires it to consider multiple factors in reaching an equitable conclusion. In re Marriage of Rockwell, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). These factors include: (1) the nature and extent of the community property, (2) the nature and extent of the separate property, (3) the duration of the marriage, and (4) the economic circumstances of each spouse at the time the

---

[5] Our record shows that the designation of clerk's papers did not specify the exhibit numbers and description of the exhibits that Charles wished to have transmitted to this court, as required by RAP 9.6(b)(3).

division of property is to become effective. RCW 26.09.080. In weighing these factors, the trial court "may properly consider a spouse's waste or concealment of assets." In re Marriage of Wallace, 111 Wn. App. 697, 708, 45 P.3d 1131 (2002) (citing In re Marriage of White, 105 Wn. App. 545, 551, 20 P.3d 481 (2001)).

A fair and equitable distribution "'does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties.'" In re Marriage of Zahm, 138 Wn.2d 213, 218-19, 978 P.2d 498 (1999) (quoting In re Marriage of Crosetto, 82 Wn. App. 545, 556, 918 P.2d 954 (1996)). Furthermore, all property, both community and separate, is before the trial court for distribution. Friedlander v. Friedlander, 80 Wn.2d 293, 305, 494 P.2d 208 (1972).

Charles and Jennifer had a high standard of living during their marriage. Shortly after moving to Washington, Charles was awarded $820,000 in an arbitration against HBI. Starfish was a successful business venture with a "substantial" cash flow up until its supplier went out of business. At the time of separation, the parties owned two houses, one of which was free of any financial encumbrances. The parties should have had a significant amount of community property for the trial court to apportion.

However, during the four years that the dissolution was pending, Charles dissipated the community assets. Charles did not keep his business and personal income and expenses separate. He regularly used Starfish's money to pay for personal expenses, including paying off his personal credit cards.

Additionally, from November 1, 2017[6] until October 1, 2020, Charles wrote $286,152.69 worth of checks to himself from Starfish, only $76,562.50 of which could be attributed to payroll. Charles claimed that the remaining $210,000 was for repayment of a loan he made to the business, but the trial court did not find his testimony credible. The trial court thus found that Charles dissipated at least $319,000 worth of community assets during the period of separation. The trial court noted that the amount dissipated was likely much higher than that, but it could not locate all of Starfish's cancelled checks among the thousands of pages of exhibits submitted to the court.

After the parties separated, Charles continued to maintain his high standard of living, whereas Jennifer did not. While Charles was earning approximately $15,000 per month, Jennifer was earning less than a third of that amount. Jennifer's attempt at a business venture failed, and she needed to use her credit card to pay her attorney fees.

Charles additionally possessed a significant amount of separate property, including approximately $240,000 in retirement accounts, a Ford F-150, a Harley Davidson motorcycle, and a Ford Focus. Jennifer's only separate property was her vehicle.

In dividing the property between the parties, the trial court recognized that it was not ordering an equal split of community property. However, it concluded that the split was just and equitable due to Charles's dissipation of community

---

[6] The trial court stated that it "was not able to track all the checks made out to Mr. Bachmann because the parties only started to include cancelled checks with the [bank statements] beginning November 1, 2017."

assets. As discussed in section II, supra, the trial court's findings and conclusions on this point were well founded.

Additionally, the trial court concluded that the uneven division of community property was just and equitable because Charles had a far greater future earning potential than Jennifer. At the time of trial, Charles was earning over three times Jennifer's salary. Charles had successfully operated two businesses (HBI and Starfish), whereas Jennifer's business venture had failed. This was proper for the court to consider in the distribution of assets, see Zahm, 138 Wn.2d at 218-19, and supports the trial court's decision to award more of the community property to Jennifer.

Furthermore, when both separate and community property are considered, as they must be, it is evident that the division of property was both just and equitable. Both parties were awarded all of their separate property. The value of Charles's separate property was significantly greater than that of Jennifer's. The result was that both parties were awarded property of roughly equal value. Given this result, we cannot say that the trial court's award was either unjust or inequitable.

The trial court's division of property is well-grounded in its findings of fact and conclusions of law. There was no abuse of discretion.

IV

Charles requests an award of attorney fees. Because he is not the prevailing party and did not devote a separate section of his brief to his request, see RAP 18.1(b), we deny his request.

13

Jennifer also requests an award of attorney fees. When a party requests an award of fees on appeal on the basis of financial need, the party must file and serve a financial affidavit "no later than 10 days prior to the date the case is set for oral argument or consideration on the merits." RAP 18.1(c). Jennifer complied with this rule. While Charles was permitted to submit a response, see RAP 18.1(c), he declined to do so. Because Jennifer's financial affidavit demonstrates her need and Charles has not filed an affidavit demonstrating his inability to pay, see Mansour v. Mansour, 126 Wn. App. 1, 17, 106 P.3d 768 (2004), we hereby grant Jennifer's request for attorney fees and refer the matter to a commissioner of this court for a determination of the appropriate amount of the award.

Affirmed.

Dwyer, J.

WE CONCUR:

Díaz, J.

Birk, J.